GREENVILLE *v.* MASON.                { Aug. 11, 1876.

*Perambulation—Fraud.*

It being alleged in the bill, and admitted by the general demurrer, that the defendants' selectmen had by fraudulent misrepresentations induced the plaintiffs' selectmen to join in an erroneous return of the perambulation, the defendant town was perpetually enjoined from using such return in evidence.

FROM HILLSBOROUGH CIRCUIT COURT.

IN EQUITY. The facts are sufficiently stated in the opinion of the court.

*Geo. Y. Sawyer & Sawyer, Jr.*, for the defendants.

I. This is not a case under the statute of an application to the court to establish the boundary of adjoining towns, because of the disagreement of the selectmen in attempting to renew or establish it upon a perambulation of the line.

The statute merely declares that " when the selectmen shall disagree in renewing or establishing the bounds, * * the court, upon petition, shall examine, * * and their decision shall be final." Gen. Stats., p. 113, ch. 47, sec. 6. Such has ever been our statute provision on the subject since the first enactment, of December 23, 1820. Laws of N. H., ed. of 1824, p. 46 ; ed. of 1830, p. 445 ; Rev. Stats., p. 101.

The power of the court under the statute is limited to the case of a positive disagreement of the selectmen in making the perambulation, resulting in no establishing of the line, and no return of the courses and distances, marks and monuments, signed by the two boards, and filed of record in the town-clerk's office. Gen. Stats., ch. 47, sec. 3. The bill substantially sets forth that here there was no such disagreement ; for it alleges that in fact there was a perambulation, an establishing of this line, in which all concurred, and a return, setting out the courses and distances, marks and monuments, signed by all, and filed of record in both offices. Under the authority conferred by statute, the court, then, has no power to interfere.

II. Under the general equity powers of the court, they cannot interfere for the purposes aimed at by this bill. The only ground alleged, or shown in proof, for asking the intervention of the court is, that there was a fraud practised, or a mistake committed, in the perambulation, but without alleging any controversy between two parties, or any existing right, claim, or matter in dispute, to be affected, which is the proper subject for judicial adjudication. The ground taken by the complainants in substance is, that here is a fraud or mistake, and therefore,

under the general doctrine that courts of equity may take cognizance of cases of fraud and mistake, this court should take cognizance of the case and apply a remedy. But the equity powers of the court do not extend to all cases of fraud or mistake merely because there is a fraud or mistake. It is only when the matter in which the fraud or mistake occurred is one within the domain of judiciary power, falling under judicial cognizance, that the equity power attaches, and the remedy in equity is to be applied.

Under our constitution the three essential powers of government— the legislative, executive, and judicial— are to be kept separate and independent of each other. Now, the matter of defining and establishing on the land the boundaries of towns is exclusively within the scope of the legislative power. It is one with which the judiciary has nothing to do, except so far as the statute confers power on the court in that regard. It is a matter of a public nature, in no way concerning private rights, except as they may incidentally .be affected by the governmental act of defining and locating the line. The mere ministerial act of establishing the lines by marks and monuments upon the land, as done by selectmen under the statute, is but the work of commissioners under legislative authority to effect a public object. As such, it is not within the scope of judicial power to regulate or control the proceedings in the performance of this public duty, merely for the purpose of having it performed correctly, or of applying a remedy for fraud or mistakes. Suppose the legislature had enacted that town lines should be fixed and located by a surveyor-general, to be appointed by the governor and council, and that his duty should be once in seven years to renew and establish the lines, and make returns of the courses and distances, marks and monuments: would it be contended that it was within the judicial power to correct his errors occurring from fraud or mistake, merely because the general rule is that courts of equity may take cognizance of cases of fraud and mistake ? Elections to public office, it is said, are sometimes conducted fraudulently : certainly, mistakes have been made in counting and returning votes. The candidates are thereby incidentally affected, sometimes, it may be, to the loss of the coveted office. What aggrieved candidate was ever advised, by counsel learned in the law, that the court sitting in equity could remedy the fraud or correct the error upon a bill filed merely for the purpose of having the remedy or correction applied, because such court has cognizance of cases of fraud and mistake ? Commissioners were appointed under the reimbursement acts to determine. the amount in bonds to which each town was entitled, depending upon the number of men and time of service furnished by the towns upon their several quotas. Could an error in the count of the men, though occasioned by the fraud of one of the commissioners practised upon his fellows, have furnished ground for a bill in equity for the relief of the town incidentally affected ?

These are cases exclusively within the domain of the legislative power, and not subject to adjudication in the courts, being matters of a public nature, though, it may be, incidentally affecting private rights.

As such, they cannot be brought under the cognizance of the judiciary for correction of errors, arising even from fraud, without trenching upon legislative ground. If they are subjects for judicial inquiry and correction, then are all errors in every department of government, to the minutest details, subject to the revision and correction of the judiciary.

It was once said that courts are greedy of jurisdiction. This was when the sound principles of constitutional law were not perhaps quite so well understood and practised upon as in these latter days. This court, we are quite sure, will limit the exercise of their judicial power to the investigation and decision of questions strictly judicial.

That the view here taken is sound is obvious, we submit, from a consideration of the allegations of the bill and the relief sought. The bill sets forth the erroneous location and return of the line, and the assertion by the selectmen of Mason of " the claim of jurisdiction up to it," and prays that the return be annulled and the town enjoined from making any claim under it. Here is no allegation of any act done violating or infringing upon the rights of the plaintiff town, or subjecting them to any wrong for which redress is to be had by annulling the return. It is only alleged that the selectmen of Mason assert the claim of that town to " jurisdiction up to the line," and therefore relief is sought from the anticipated mischief of their exercising jurisdiction by annulling the return. What in legal intendment is to be understood by the averment that the town will " claim jurisdiction " may not be quite clear. We suppose it is to be understood as an allegation, that the town will claim the right to tax the estate and polls, and exercise other public powers on the adjacent territory up to the line as located by the return. If Mason had in fact taxed them, and this were averred, it would be no wrong, in contemplation of law, to Greenville; for if taxed rightfully, Greenville would have no ground of complaint, and if wrongfully, Greenville might rightfully tax notwithstanding. Still less does the mere threat, to tax in future, furnish ground for complaint.

Nor has Greenville any legal interest in the subject-matter of the bill, such as to sustain it, even if there were grounds for maintaining it against Mason. Assuming it to be true that Mason's threatening to exercise jurisdiction up to the line would be good ground in equity for maintaining the bill against Mason, in order to obtain a decree for annulling the return, yet Greenville has no private personal right or interest in the subject-matter of the bill, to wit, the jurisdiction for taxation, or any other object; and without such right or interest to be protected by the decree sought, the bill cannot be sustained. In respect to such jurisdiction, the town has a widely different character, and stands in a very different relation, from that which it holds in respect to its poor-farm or other property, or any private rights which it may have in common with individuals. As to all such properties or rights, the town has the same remedies in the courts as individuals. But as to its territorial jurisdiction and its established boundaries, it was created and its limits defined for public purposes, as part of the machinery of government, its principal functions being to assess and collect public taxes, sup-

port common schools, build and maintain highways, relieve paupers, and conduct elections. These are all public duties properly devolving upon the government. In exercising jurisdiction in any of these particulars the town acts as part of the sovereignty of the state, and its right to this jurisdiction within its established territorial limits is held, not as property for the use and benefit of the town as a municipality, but as an attribute of sovereignty under the legislative power for public purposes, and according to the policy of the state, adopted, regulated, and controlled by the legislative power. If this right to exercise jurisdiction within its established limits is impaired, interrupted, or defeated by any wrongful act, this causes no damage to the town for which it is entitled to compensation in law or equity, for it is not the private personal right of the town which is violated or infringed, but the public policy of the state, which through the legislative power adopts towns, with established boundaries to limit their territorial jurisdiction, as the agent or instrumentality for effecting these important functions of government. The whole subject is of a political and not a judicial character. The bill sets out a violation or infringement of the policy of the state in locating and returning the line different from that established, and asks the court to apply a remedy. This it is the province of legislative power alone to provide, and the remedy is obvious,—an amendment of the statute, conferring power upon the courts to correct an error in the location and return of the line on petition of either town, and proof of the error ; or, the legislative remedy might be made to apply to this case alone by providing for the appointment of a commissioner, who should hear the towns, determine the location, fix marks and monuments, and whose return, approved by the court, filed in the town-clerk's office, should be conclusive.

III. In the views thus far presented it has been assumed that the return of the selectmen establishing the line is to be held conclusive. This we deny. We maintain that the perambulation and renewing and establishing the line are merely for the purpose of making and preserving *prima facie* evidence of the boundary, subject to be controlled by other proofs. Such seems to be the view taken in *Pitman* v. *Albany*, 34 N. H. 577. If this view is correct, a bill in equity would not lie for annulling the return, even if upon all other grounds it might be sustained, for on this view Mason may exercise jurisdiction precisely as if the return had not been made, and sustain the jurisdiction in a court of law, without the aid of this bill, by the very proofs here produced to support it. The court will be slow to sustain proceedings in equity of this novel character for the purpose of removing mere *prima facie* evidence out of the way of a party's legal rights. 1 Ves. 245; 2 Ves. 41; 3 Atk. 214.

If either or both towns have exercised, or shall hereafter exercise, jurisdiction by taxing, the question may be presented in a form to be determined judicially, involving a private, personal right—the liability of the tax-payer. The proofs here presented might, in a suit at law by

the tax-payer, control the return, if merely *prima facie* evidence. If conclusive, then a bill in equity might well be maintained by him for setting aside the return as to him, for his bill would be founded on his private personal right to be relieved from the tax. So presented, the question would be a judicial one, within the province of the judiciary to try and determine.

The cases in the reports on the subject of confusion of boundaries have no application to a question of this character. Those are all cases of controverted rights or claims between individuals, and where some supervening equity beyond the mere question of boundary brings them within the cognizance of a court of chancery. Even in reference to the boundaries of private estates, it is not enough that the boundary is in controversy. Some ground for equity to stand upon must exist beyond that. Here it is not a private contract, and there is no ground of equity except that there is a controversy as to the boundary. See 1 Story Eq. Juris. 588—Chapter on Confusion of Boundaries.

*Wadleigh & Wallace* and *A. W. Sawyer*, for the plaintiffs.

The bill alleges and the demurrer admits the fraud of the selectmen of Mason, by which they procured a wrongful location of the town line, and that, though admitting it to be wrongful, they refuse to correct it, assert it to be binding, and claim jurisdiction up to it. The bill asks for a decree annulling the return, and enjoining the town of Mason from making any claim under it.

It is contended in the defendants' brief,—1st, that the selectmen, in making perambulations, are commissioners acting under legislative authority, and that relief against their fraud would be an illegal interference with the legislative department of the government; 2d, that the town of Greenville has not sufficient interest in the subject-matter of this bill to sustain it; 3d, that the return is merely *prima facie* evidence, and that therefore the court will not annul it.

Though the capacity in which selectmen act in making perambulations may not be entirely clear, yet it is clear that they are not legislative commissioners. If they were such, their returns would be as binding as an act of the legislature : their location of the line would be an act of legislative authority, and conclusive ;—yet it is not conclusive, and the defendants contend that it is merely *prima facie* evidence.

To hold that the selectmen are legislative commissioners, and yet that the line established by them may be impeached by evidence and set aside by the verdict of a jury, would be absurd, and no authorities can be adduced in support of such a theory.

It seems, upon the authorities, that selectmen in making perambulations act as the agents and officers of their respective towns, rather than in a *quasi* judicial capacity. *Pitman* v. *Albany*, 34 N. H. 577 ; *Lawrence* v. *Haynes*, 5 N. H. 35, 36 ; *Adams* v. *Stanyan*, 24 N. H. 405.

And the evidence resulting from the perambulations of the lines between towns is of the same nature as that which results from the acts

of owners of adjoining lands, when they perambulate the lines between their lands, and by agreement renew the marks and monuments. *Ib.*

As such, in the absence of fraud, it must be not merely *prima facie* but strong evidence of the line. In this case the return, made a part of the records of each town, resembles a written agreement made by the individual owners of adjoining lands. But here the town of Greenville, unlike an individual, has no remedy at law. It may tax the inhabitants of the disputed territory, and they may, if they see fit, go to law to evade the payment of the tax. But in that case the defendants would not be a party to such suits: they would not be bound by the judgments therein, and their fraud could not be shown to impeach the return. The return would be evidence, and would, perhaps, be conclusive evidence in the minds of a jury, when, having been procured by fraud, it ought not to be received as evidence at all.

Under these circumstances, a court of equity may, on general principles, annul it. *Stone* v. *Anderson*, 26 N. H. 506; *Winnipiseogee Lake Co.* v. *Worcester*, 29 N. H. 445; *Downing* v. *Wherrin*, 19 N. H. 9; *Marston* v. *Brackett*, 9 N. H. 337; *Rand* v. *Redington*, 13 N. H. 72, and *passim;* Story Eq. Jur. 700.

It has been held that where a confusion of boundaries has been occasioned by fraud, that alone will furnish sufficient ground for the interference of a court of equity—1 Story Eq. Jur., sec. 619, and authorities, *Merriman* v. *Russell*, 2 Jones Eq. 470 ;—also, that a bill in equity will lie to ascertain and fix boundaries when it will prevent a multiplicity of suits. 1 Story Eq. Jur. 621.

In this case, by gross fraud on the part of the defendants, whose duty it was to establish and perpetuate the true boundaries, a return was procured and recorded which establishes a wrong line, and cheats the town of Greenville out of a part of its territory. The town of Greenville has no remedy at law, and years may pass before it can show the incorrectness of the return. It may never have an opportunity to show the fraud of the defendants in a court of law. The plaintiffs ask that the return which confuses the boundaries, and which was obtained by fraud, may be annulled ; and this the court may lawfully do, not only upon the rules of equity relating to the cancellation of written instruments obtained by fraud, but under the jurisdiction which it has over the confusion of boundaries, and for the prevention of such confusion.

It cannot be doubted that the town of Greenville has a sufficient interest in the subject-matter to maintain this bill. By the fraud of the defendants, it has made and put upon its own records a return which cheats it out of a portion of its territory. Though not the owner in fee of the soil, it has the right to tax it and assess taxes upon the inhabitants of it. That soil and the inhabitants upon it should contribute towards paying the debts of Greenville, its state and county taxes, and towards its share of other public burdens. It has been held that depriving a citizen of any public right or franchise furnishes a cause of action against a wrong-doer. Here the defendants committed the

fraud for the purpose of gaining the right of taxation, and that right the town of Greenville will lose if the fraud succeeds. How can it be contended that it has no interest in the subject-matter, and that the fraudulent document must be allowed to remain to poison fountains of justice in future controversies ?

CUSHING, C. J.   This cause was transferred to the superior court on general demurrer, with a provision that if the bill should be held maintainable, a final decree should be entered for the plaintiffs. The bill stated, in substance, that the selectmen of Mason, after due notice, met the selectmen of Greenville on the fifth day of December, 1872, for the purpose of fixing upon the line between said towns, and setting up marks and bounds according to law ; that the selectmen of Mason, by certain false and fraudulent representations as to the position of the south line and the south-west corner of Mason, induced the selectmen of Greenville to consent to an incorrect and wrongful location of the line between said towns, and to sign a return establishing marks and monuments according to such incorrect location, whereby a part of the territory of Greenville was included within the territory of Mason ; that the selectmen of Mason, admitting that the line is incorrect, claim that Greenville is bound thereby, and refuse to take any measures to correct the error, and assert that Mason will claim and exercise jurisdiction up to that line ;—and the plaintiffs pray that it may be ordered and decreed by said court that said return may be annulled, and that Mason may be forever enjoined from making any claim under it, and for such other relief as may be just.

By the " act to constitute the town of Greenville from a part of the territory of the town of Mason," approved June 28, 1872, the boundaries between Mason and Greenville are determined by the boundaries of certain lots; and by "An act to confirm and establish the boundary line between the towns of Greenville and Mason," approved July 2, 1873, the boundary line between those towns was established, to be as it was enacted to be in the statute just cited.  Exactly what this statute is or was intended to be I am unable to say, and perhaps it is not necessary to determine, since it in no respect alters the first statute.

On the demurrer it is to be taken, then, that the allegations in the bill are true, and the charge of fraudulent misrepresentation sustained.

By the act of 1872, above referred to, the boundaries of certain lots were made the boundaries of the line dividing the old town of Mason from the new town of Greenville. The only authority which the selectmen had, that I can find, for their action, was in the law providing for the perambulation of towns, and the renewal of the marks and bounds ; and it is the result of a perambulation under the statute which the plaintiffs claim to be fraudulent, and against which it seeks relief.

The earliest statute which has come to my knowledge on the subject is the act of 1719.  Province Laws, p. 136.  This act appears to have continued in force until the year 1791, when the provision for recording the proceedings of the selectmen was enacted.

The provisions of these acts for perambulation were substantially reënacted in 1827, on the revision of the statutes in 1842, and by the General Statutes of 1867.

It is obvious to remark, that in these statutes no power is given to the selectmen, by agreement or otherwise, to establish a monument or a boundary. Their only function is to renew. The statute takes it for granted that the monuments being renewed every seven years, there could never be any difficulty or dispute about it. It supposes that there will be no difficulty in finding the marks and bounds, that the presence of the officers of each town would be a sufficient check upon those of the other, and that there could be no difficulty in making a satisfactory return, to be recorded in the books of each town.

The experience of thirty years, however, seems to have proved that this expectation could not be realized, and that cases would occur in which the selectmen would disagree about what marks and bounds were to be renewed; and it was found necessary to remedy the inconvenience by further legislation.

This was effected by the act of December 23, 1820, by which it was provided that in case of a disagreement of the selectmen the matter should be referred to the court of sessions, whose decision should have the same effect as an agreement of the selectmen. By the statute of June 26, 1827, the same provisions, substantially, were enacted, excepting that the court of common pleas was substituted for the court of sessions. By the Revised Statutes of 1842, ch. 37, sec. 6, an important change was introduced, and it was enacted that the decision of the court should be final and conclusive.

The term *perambulation* is not new to the law or custom of our English ancestors. In Hone's " Year Book," p. 589, is found the following account of a perambulation :

"*A perambulation*, or, as it might be more correctly called, a circumambulation, is the custom of going round the boundaries of a manor or parish, with witnesses, to determine and preserve recollection of its extent, and to see that no encroachments have been made upon it, and that the landmarks have not been taken away. It is a proceeding commonly regulated by the steward, who takes with him a few men and several boys, who are required to particularly observe the boundary lines traced out, and thereby qualify themselves for witnesses in the event of any dispute about the landmarks or extent of the manor, at a future day. In order that they may not forget the lines and marks of separation, they ' take *pains* ' at almost every turning. For instance : if the boundary be a stream, one of the boys is tossed into it ; if a broad ditch, the boys are offered money to jump over it, in which, of course, they fail, and pitch into the mud, where they stick as firmly as if they had been rooted there for the season ; if a hedge, a sapling is cut out of it, and used in afflicting that part of their bodies on which they ·rest in the position between standing and lying ; if a wall, they are to have a race on the top of it, when, in trying to pass each other, they fall over on each side,—some descending, perhaps, into the still stygian

waters of a ditch, and others thrusting the 'human face divine' into a bed of nettles ; if the boundary be a sunny bank, they sit down upon it, and get a treat of beer and bread and cheese, and perhaps a glass of spirits." The writer goes on to say, that " in years after, when the boys had become men, they would remember the brook by the wetting they had in it, the wall by the muddy ditch or the bed of nettles, the hedge by the flogging, and the sunny bank by the good cheer enjoyed upon it."

This description seems to contain the whole theory of the law on the subject of *perambulations*. It is always necessary in proving the boundaries called for in a charter, or in a deed, or in any other document, to identify the monuments by extrinsic testimony. So long as the witnesses are alive who saw the monuments placed in position and were present at the running of the lines, they can testify of their own knowledge to those monuments ; but when those original witnesses are dead, which usually happens in no very long period of time, there is absolutely no means of identifying the marks and bounds excepting by tradition, hearsay, or reputation, for I believe that in this connection these words are nearly synonymous.

In Phillipps on Evidence, ch. 13, sec. 2, perambulations are discussed under the head of hearsay evidence. He says that Lord ELLEN-BOROUGH, in *Weeks* v. *Sparke*, 1 Mau. & Selw. 687, " observes, upon the subject of perambulations, that they are in the nature of hearsay evidence, not of particular acts done, as that such a turf was dug, or such a post put down in a particular spot, for that would amount to evidence of ownership, but they are evidence of the ambit of any particular place or parish, and of what the persons accompanying the survey have been heard to say and seen to do on such occasions. And LeBlanc, J., observes, in the same case, that the evidence of perambulations might be considered, in a certain degree, as evidence of the exercise of a right, yet that it had been usual to go further, and admit the evidence of what old persons who are deceased have been heard to say on those occasions ; "—and in the note to this passage Phillipps says,—" It is to be observed that perambulations are actually attended by a great number of strangers, as well as by official persons, commonly called the spadesmen. Perhaps, in giving evidence of the declarations of perambulators, it would be presumed that they were made by persons conversant with the boundary in question, and the occasion of the declaration might be considered as giving them weight."

I take it that few boards of selectmen would be so imprudent as to undertake a perambulation without the aid of some experienced surveyor, conversant with the marks and bounds, or the presence of those inhabitants of the towns whose age and acquaintance with the subject would enable them to point out the desired boundaries. Thus, the return of the selectmen, placed upon the records of the towns, would be, in fact, the result of what they could gather of the traditions and reputation with regard to those boundaries. It would be an infinitely more reliable aid to the memories of witnesses than the *pains* which, in the foregoing description of the English perambulation, are said to be inflicted upon the

boys who are intended for witnesses. In fact, the statute having provided for the making of this record, I think we must infer an intention to make it evidence of the traditions and hearsay and reputation at the time when the perambulation was made. I am obliged to confess that I cannot now conceive of any other evidence which could possibly be expected of the identity of the marks and bounds, excepting what could be derived from the statements of living persons conversant with them.

None of these statutes provide for the use of the selectmen's records of perambulations as evidence in any case, and it was left wholly for the courts of law to determine what their effect should be.

The first case which I have found in the reports is *Gorrill* v. *Whittier*, 3 N. H. 265. In this case it was held that selectmen have authority under the statute of 1791 to agree where an existing line is, and that such an agreement would be conclusive upon the subject; and a determination of the sessions under the statute of 1820, where an existing line between two towns was, was held to be conclusive. This was a suit between individuals, whose disputed boundary was the line between towns; and, if I understand the case, it was substantially held that the determination of the sessions under the statute of 1820 was conclusive between those parties.

The next case in order is *Lawrence* v. *Haynes*, 5 N. H. 33, in which it was held that the determination of the court of sessions establishing the line, in a suit between the towns, was not evidence of the true line between the parties, Lawrence and Haynes. On this part of the case RICHARDSON, C. J., says,—" It did not appear that either of these parties was in any way a party to those proceedings. The whole must therefore be considered with respect to this plaintiff and defendant as *res inter alios acta ;* and we consider it as settled that no record of an adjudication can be used as evidence of the facts upon which it is founded, in a suit between persons who are strangers to the adjudication." To this point he cites *Burrill* v. *West,* 2 N. H. 190; Starkey's Ev., Part 2, secs. 60 and 57.

The court also held that perambulations by the selectmen of the towns were evidence between the parties to the same suit. In this case the same learned judge says,—" The lines of our towns have been so frequently perambulated, and the bounds and marks so frequently renewed, that the selectmen have always had the means of ascertaining the true line. It has been their duty to preserve the marks and monuments of the real line; and it has in all cases been the interest of one party at least in every case to adhere to the real line, and to suffer no encroachments. It would be very singular if the circumstance that a line has been perambulated and marked as the true line by men who had the means of knowing whether it was the true line or not, and whose duty and whose interest bound them to perambulate and to mark no line but the true one, must be held to afford no evidence of its being the true line. It cannot be holden : it is in all cases evidence.

"When a particular line has often been perambulated, and the bounds renewed and recognized by the selectmen of both towns, it is strong

evidence of its being the true line.  Phillipps's Ev. 183 ; 1 M. & S. 685 ;
14 East. 330, note ;  Nicholls v. Parker, Starkey's Ev., part 1, p. 62,
note z.

"The evidence resulting from the perambulation of the lines between
towns is of the same nature as the evidence which results from the acts
of the owners of adjoining lands when they perambulate the lines be-
tween their lands, and by agreement renew the marks and monu-
ments."

Again : the same judge says, further on,—" It can hardly admit of a
question that these perambulations are evidence in a controversy be-
tween towns as to the lines between them.  But are they evidence in
a suit between individuals ?  We think that they are.  The declara-
tions of deceased persons, who had no interest to misrepresent, are evi-
dence of boundaries between the lands of individuals.  And it seems
to us that these perambulations, which are made by men who must be
considered as public officers, and are made for public purposes, are en-
titled to a degree of credit which the declarations of deceased persons
can under no circumstances claim.  Starkey's Ev., part 2, sec. 47."

The next case in order is Bailey v. Rolfe, 16 N. H. 247.  In this
case it was held, according to the head note, that the perambulation of
town lines is not evidence as to which of the two lines was the one in-
tended by the act of the legislature fixing the common boundary of two
towns, especially if it does not appear that a question has arisen as
to which was the true one, and has been judicially decided by the se-
lectmen in their perambulations.

GILCHRIST, J., after citing Gorrill v. Whittier, ub. sup., says,—" It
may not be necessary in this case to decide as to the application of the
principle of that case, or as to the extent or degree to which the per-
ambulations of selectmen are evidence of the common boundaries of
their respective towns.  It is plain that the power to agree in cases of
doubt may in some contingencies amount of necessity to a power to
substitute a conventional for the true line.  But we think that such
cannot be the effect of perambulations where no questions appear to have
arisen, and a line appears to have been adopted without any reference
to another and widely different line, and without any intention on the
part of the selectmen to decide judicially between the two lines.

"The question here is, not where the line is which the selectmen in-
tended to perambulate, but whether the line which they intended to per-
ambulate was the one indicated by the act.  This, as we have intimated,
is a question which does not appear that they ever undertook to settle ;
and it may be added, that it is one which is at least doubtful whether
they had any power to settle, had they ever sought to do so."

The last case I have seen on this subject is Pitman v. Albany, 34 N.
H. 577.  In this case one of the head notes is as follows : " The pro-
ceedings of the selectmen of the adjoining towns in perambulating the
line and renewing the marks and bounds are not conclusive evidence
of the true location."  SAWYER, J., says,—" What the force and effect
of an agreement of the selectmen were to be was not expressly declared

by either of these statutes. It was left by them to judicial interpretation. The object and intention of the legislature in these enactments could have been only to provide a mode for supplying fresh evidence, as often as once in every seven years, of the town lines, by a renewal of the old monuments and marks which fixed their location. The authority of the selectmen was in terms confined to renewing such marks and bounds—reviving the lost or doubtful evidence upon the land itself of the true boundary. The acts did not contemplate a negotiation by the selectmen in behalf of their respective towns for establishing a line, or an adjudication by the joint boards upon the question when it admitted of controversy or doubt. They were required to assent to and coöperate in the renewal of the marks and monuments upon the line which they understood to be the true and established boundary. Their proceedings were therefore ministerial rather than judicial."

Further on, the same learned judge, speaking of the judgment of the court of sessions, or the court of common pleas, under the statutes in force prior to the revision in 1842, in a case of disagreement between the selectmen of two towns, and which by those laws were to be of the same effect as the perambulations of selectmen, says,—" Such judgment, therefore, under those statutes, must be considered not to be conclusive, but merely to constitute evidence to be weighed by the jury with other evidence upon the matter, whenever the question as to where the true boundary was was put in issue."

Such are the principal utterances of the courts of New Hampshire on the subject of the records of perambulations of town lines as evidence. The statutes in no instance, that I remember, say anything about the use of such perambulations as evidence. They do not declare that they shall have any force, or if any, what. That is left to be deduced by the courts from the application of the principles of evidence, established by the common law, to such cases. It seems clear to me, as is said by SAWYER, J., in *Pitman* v. *Albany*, that the selectmen have no judicial powers. They cannot determine judicially any disputed question in regard to the lines. Their whole function is ministerially to renew the marks and boundaries which they find upon the land. If they cannot find the same marks and boundaries, or, in the words of the statute, " agree," the court has now power to decide the question. The effect of the selectmen's doings appears to depend upon the same principles of the common law which determine the effect of perambulations under the English custom of which I have spoken.

The present case finds that the respondents, selectmen of Mason, fraudulently induced the selectmen of Greenville to falsify a record of this nature ; that, by giving false information, and which they knew to be false, in regard to certain matters connected with the marks and bounds, they induced the agents of Greenville to consent to the renewal of these marks and bounds in false positions, and to make a record of such false renewal to stand for all time as *prima facie* evidence of a falsehood. If this record is permitted to stand without objection, in the lapse of not many years the witnesses will be dead who knew about its falsification,

and the record will stand as evidence which will always embarrass those who are seeking for the truth. If the fraud had not been discovered, perhaps in the space of the first seven years the record would have become established, and the fraud of the officials of Mason achieved.

There ought to be some remedy found for this wrong. It must be true that from the arsenals of the law some weapon can be drawn with which successfully to combat this fraud. If the facts are not as they now stand admitted by the demurrer, they ought now to be investigated.

Whether this record is a public act done by a coördinate branch of the government of equal power with the judiciary or not, I think it certain that the court has jurisdiction over these towns and their agents, and whatever the state of New Hampshire might do, or however it might choose to be bound by the fraudulent acts of selectmen considered as its ministerial agents, it seems to me clear that this court has the same power to prevent the defendant town from availing itself of the fraud of its selectmen, that it would have to prevent them from taking advantage of a contract, or a judgment obtained, by a similar fraud, and that this may be done by a suit instituted for the purpose under a sufficiently familiar head of equity jurisprudence. Story's Eq. Jur., sec. 820.

The result therefore is, that the town of Mason must be forever enjoined from making use of this record as evidence; and, according to the principles of the cases cited, this should be not only against its use as evidence against Greenville, but also against any other parties.

Ladd and Smith, JJ., concurred.

*Decree accordingly.*